# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ASHTON WILKINS,<br>            Plaintiff,<br><br>      v.<br><br>DISTRICT OF COLUMBIA, *et al.*,<br>            Defendants. | Civil Action No. 17-884 (CKK) |

## MEMORANDUM OPINION
(September 30, 2020)

On March 8, 2016, officers of the Washington, D.C., Metropolitan Police Department ("MPD") arrested Ashton Wilkins ("Plaintiff") at Gallery Place, located on the 700-block of 7th Street, N.W., Washington, D.C.   MPD officers Amina Coffey, Anthony Willis, Jr., Cameron Reynolds, Owais Ahktar, and Sergeant Francis Martello were each present at the time of Plaintiff's arrest.   On the basis of this arrest and its attendant circumstances, Plaintiff has asserted constitutional and common law claims against each of the individual officers and also against the District of Columbia, under the theory of *respondeat superior* (collectively with the individual officers, "Defendants").

Specifically, Plaintiff has raised four constitutional claims under 42 U.S.C. § 1983: Excessive Force (Count VI), False Arrest (Count VII), Fabrication of Evidence (Count VIII), and Retaliatory Arrest (Count IX).   Plaintiff also asserts five parallel claims at common law: Assault (Counts I and II), False Arrest (Count III and IV), and Malicious Prosecution (Count V).   Presently before the Court is Defendants' [21] Motion for Summary Judgment.   Upon consideration of the pleadings, the relevant legal authorities, and the record as a whole,[1] the Court **GRANTS**

---

[1] This Memorandum Opinion focuses on the following briefing and evidence submitted by the parties:
- Am. Compl., ECF No. 11;
- Defs.' Mot. for Summ. J., ECF No. 21;

Defendants' Motion as to Plaintiff's claims for Excessive Force (Count VI), False Arrest (Counts III, IV, and VII), Malicious Prosecution (Count V), Fabrication of Evidence (Count VIII), and Retaliatory Arrest (Count IX).  The Court, however, will refrain from exercising supplemental jurisdiction over Plaintiff's claims of common law assault (Counts I and II) and will **DISMISS** those claims **WITHOUT PREJUDICE**.

## I.    MOTION TO STRIKE

The Court will first address Plaintiff's [49] Motion to Strike.  This motion seeks to strike Defendants' *Errata* filing from December 30, 2019, *see* ECF No. 48, which provided a corrected submission of Defendants' original Motion for Summary Judgment and the paper exhibits thereto, *see* ECF No. 21.  As Defendants explain, the *Errata* submission includes no substantive changes to the original summary judgment briefing.  Instead, the *Errata* corrects two clerical errors: (1) it revised an inaccurate citation to the transcript of Mr. Joseph Johnson and supplied a single-page of corresponding deposition transcript, and (2) the *Errata* removed two pages of transcript from the deposition of Officer Anthony Willis, improperly included in Defendants' Exhibit C.  *See* Defs.' Mem., ECF No. 50, at 2.  The Court has reviewed these revisions, including the supplemental page of deposition transcript from Mr. Johnson, and notes that they have no substantive impact on the Court's disposition of this action.  Accordingly, Plaintiff's [49] Motion to Strike is **DENIED**.  The Court will consider and cite to Defendants' corrected summary judgment brief and exhibits found respectively in Attachments A and B of the *Errata*, ECF Nos. 48-1, 48-2.

---

- Defs.' Stmt. of Undisputed Material Facts ("Defs.' Stmt."), ECF No 21–1;
- Pl.'s Opp'n to Defs. Mot. ("Pl.'s Opp'n"), ECF No. 29;
- Defs.' Stmt. of Undisputed Material Facts with Pl.'s Final Objections and Counter Stmt. of Facts ("Pl.'s Objection"), ECF No 29–1;
- Defs.' Reply, ECF No. 47;
- Defs.' *Errata*, Attachment A ("Defs.' Mot."), ECF No. 48-1; and
- Pl.'s Mot. to Strike, ECF No. 49.

## II.   FACTUAL BACKGROUND

The Court will present the background of this case in two parts.  First, the Court will provide the undisputed factual background for Plaintiff's claims.  This presentation will include those facts that are undisputed or unrefuted by the parties, as well as those facts clearly established by the video evidence in the record.[2]  *See Scott v. Harris*, 550 U.S. 372, 381 (2007) (directing courts to "view[ ] the facts in the light depicted by the videotape").  Then, having set forth the undisputed factual background, the Court will outline those central facts which remain in dispute at the summary judgment stage.

### A.  Background Supported By Undisputed Facts In The Record

On March 8, 2016, MPD Officer Anthony Willis observed a civilian named Patrick Horton Smith-Shearer "sucker punch" a pedestrian at Gallery Place, located at 707 7th Street, N.W., Washington, D.C.  *See* Defs.' Stmt. ¶ 2; Pl.'s Opp'n at 5.  During this unprovoked assault, Mr. Horton Smith-Shearer chased down the pedestrian from behind and directed a closed-fist punch to the back of the pedestrian's head.  *See* Defs.' Mot., Ex. O, at (0:00:00–22).  Before Mr. Horton Smith-Shearer could land a second punch, however, Officer Willis intervened, tackling Mr. Horton Smith-Shearer to the ground and placing him under arrest.  *See id.*; Defs.' Stmt. ¶ 2.  Officer Willis then handcuffed Mr. Horton Smith-Shearer with the assistance of his colleague, Officer Amina Coffey.  *See* Defs.' Mot., Ex. O, at (0:00:21–50); Defs.' Stmt. ¶¶ 2–4.  Mr. Horton Smith-Shearer's assault and subsequent arrest took place during the afternoon, while a large crowd of at least twenty bystanders was gathered outside in the Gallery Place common area, and while only two MPD

---

[2] The video evidence in the record includes overhead footage from fixed-position cameras and "real-time" cell phone videos from bystanders present at the scene of Plaintiff's arrest.  These videos have certain limitations, including inconsistent vantage points, sporadic camera angles, and poor resolution.  There are no body worn police camera videos available in the record.  Accordingly, the Court's factual assessment relies on the video evidence only to the extent a fact therein is clearly established by the footage available.

officers (Officers Willis and Coffey) appeared at the initial arrest scene.  *See* Defs.' Mot., Ex. O, at (0:00:00–22).  And moments after the arrest of Mr. Horton Smith-Shearer, additional pedestrians walked directly towards the area.  *See id.*, Ex. N, at (00:55–01:05).

Officers Awais Ahktar and Cameron Reynolds subsequently arrived at Gallery Place after responding to a radio request for assistance.  *See* Defs.' Stmt. ¶ 1; Pl.'s Objection ¶ 1.  By the time Officers Ahktar and Reynolds arrived, the crowd at Gallery Place had grown to a considerable size, was audibly hostile, and was encircling the arrest scene of Mr. Horton Smith-Shearer.  Defs.' Stmt. ¶¶ 3–5; *see also* Defs.' Mot., Ex. O, at (0:00:21–50).  Members of the crowd were vocally upset by the manner in which Officer Willis had tackled Mr. Horton Smith-Shearer and were directing clear criticism, including some vulgarities, towards the arresting officers.  *See* Defs.' Mot., Ex. O, at (0:00:21–55); Pl.'s Objection ¶ 7.  While attempting to control this crowd, Officer Willis left Mr. Horton Smith-Shearer with Officer Coffey and proceeded to arrest another bystander named Marquesse Favors.  *See* Defs.' Mot., Ex. E, at (16:24:00–10); *see also* Pl.'s Objection ¶ 5.  At the same time, Officers Reynolds and Ahktar were attempting to separate the surrounding crowd from the arrest scene.  *See* Defs.' Stmt. ¶¶ 3–7.  Officer Ahktar was shouting "back up" to bystanders and physically pushing some individuals out of the way to create space. *See* Pl.'s Objection ¶ 7; Defs.' Mot., Ex. O, at (0:01:00–25).

During this crowd control effort, a physical altercation occurred between Officer Reynolds and a bystander named Joseph Johnson.  *See id.*, Ex. O, at (0:01:25–40).  The altercation led both Mr. Johnson and Officer Reynolds to the ground, where Officer Reynolds then struck Mr. Johnson multiple times.  *Id.*  Plaintiff was positioned feet from Officer Reynolds at the outset of this altercation.  *See* Defs.' Stmt. ¶ 9; Defs.' Mot., Ex. F.  Plaintiff was also verbally criticizing Officer Reynolds and his treatment of Mr. Johnson, stating: "Yo, you can't do that. That's weak. You can't

do that. You can't hit him." Defs.' Mot., Ex. D (Wilkins Dep.), at 47:13–48:1. As discussed below, Plaintiff's physical conduct towards Officer Reynolds at this time remains in dispute.

Officer Ahktar then confronted Plaintiff, positioning himself between Plaintiff and the other arresting officers on the scene. *See id.*; *see also id.*, Ex. G, at (00:00–04). At this time, Officers Willis, Coffey, and Reynolds were each detaining an individual arrestee. *See id.*, Ex. G, at (00:00–04); Defs.' Stmt. ¶ 8. Officer Ahktar addressed Plaintiff verbally and motioned for him to move back, brandishing his ASP police baton above his head. *See* Defs.' Mot., Ex. G, at (00:00–04). In response, however, Plaintiff yelled at Officer Ahktar, while leaning forward aggressively with clenched fists. *Id.* Officer Willis observed this confrontation and deployed OC spray (pepper spray) into Plaintiff's face. *Id.*, Ex. G, at (00:03–06); Defs.' Stmt. ¶ 17. In response, Plaintiff raised his arms and pushed Officer Willis' hand out of the way. *See* Defs.' Mot., Ex. G, at (00:03–05). Officer Ahktar then struck Plaintiff with his ASP baton, though the nature of this use of force remains largely in dispute. *See id.*, Ex. G, at (00:03–07).

Following Officer Willis' use of pepper spray and Officer Ahktar's baton strike, Plaintiff walked away from the officers until Officer Willis pursued him on foot and attempted to place him under arrest. *See* Defs.' Mot., Ex. G, at (00:04–12). During this pursuit, Officer Willis had only one free hand available, as he was still detaining Mr. Favors, whom he had previously arrested. *Id.* When Officer Willis reached Plaintiff, a slight physical struggle ensued between them as Officer Willis attempted to move Plaintiff's hands behind his back. *Id.* Then, Officer Ahktar, along with Sergeant Martello, stepped in to assist Officer Willis with Plaintiff's arrest. *Id.*; *see also id.*, Ex. L (Martello Dep.), at 44–45. Officer Ahktar and Sergeant Martello performed a take down maneuver on Plaintiff, forcing him to the ground. *Id.*, Ex. G, at (00:04–12); *see also id.*, Ex. L (Martello Dep.), at 44–45. The officers then handcuffed Plaintiff and used no more force against

him after that point.  *See* Pl.'s Objection ¶ 29.  As a result of the encounter, Plaintiff sustained

injuries to his face and to his leg.  *See* Defs.' Stmt. ¶ 23; Pl.'s Objection ¶ 23.

On March 8, 2016, the day of the incident, Officer Ahktar completed a police report

documenting the circumstances of Plaintiff's arrest.  *See* Am. Compl. ¶ 98; Pl.'s Opp'n, Ex. 2

(Ahktar Dep.), at 124.  This report noted, in part, that Plaintiff was arrested for a misdemeanor

offense of an Assault On A Police Officer.  *See* Pl.'s Opp'n, Ex. 14 (Arrest Report), at 3.  Officer

Ahktar submitted this arrest report to the United States Attorney's Office on March 8, 2016, and

later attended a "papering conference" with the federal prosecutor to discuss the facts surrounding

Plaintiff's arrest.  *See id.*, Ex. 2 (Ahktar Dep.), at 125–127.  On March 9, 2016, the United States

Attorney's Office filed a single charge against Plaintiff in the Superior Court of the District of

Columbia for a misdemeanor violation of assaulting a police officer, in the case captioned *United*

*States v. Wilkins*, 2016-CMD-003476.  *See* Pl.'s Opp'n, Ex. 15 (Docket Sheet).  Plaintiff appeared

at an arraignment hearing on March 9, 2016, and on April 13, 2016, the D.C. Superior Court

scheduled a non-jury trial in the case.  *See id.*  The government, however, dismissed the case on

July 18, 2016, before trial.  *See id.*

### B.  Facts Remaining In Dispute

Within this background, several central facts remain in dispute.  First, the parties dispute

whether or not Plaintiff swung at Officer Reynolds' back, while Officer Reynolds was attempting

to arrest Mr. Johnson.  Defendants have presented deposition testimony from both Officers Willis

and Ahktar indicating that Plaintiff did, in fact, swing at Officer Reynolds while he was arresting

Mr. Johnson.  *See* Defs.' Mot., Ex. A (Akhtar Dep.), at 103:6–104:2; *id.*, Ex. C (Willis Dep.), at

83:13–84:6.  Plaintiff, however, flatly denies this fact, *see* Pl.'s Objection ¶ 12; Pl.'s Opp'n, Ex.

13, (Wilkins Dep.), at 77:4–14, and the video evidence in the record offers no resolution to this

dispute. The real-time footage simply does not capture the events surrounding Plaintiff's alleged "swing" at Officer Reynolds with sufficient clarity to be dispositive. *See* Defs.' Mot., Ex. O, at (01:30–02:00); *see also* Defs.' Reply, Attachment E.

Next, the parties have presented multiple factual disputes regarding Officer Ahktar's use of his ASP baton against Plaintiff. Here, Defendants allege that Officer Ahktar struck Plaintiff *once* with his ASP baton—a strike to Plaintiff's *legs* occurring at (00:04–06) in Defendants' Exhibit G. *See* Defs.' Stmt. ¶ 18. Plaintiff disagrees. Plaintiff has testified that Officer Ahktar first struck him "a *bunch* of times" on his legs in a scene not captured on video, Pl.'s Opp'n, Ex. 13 (Wilkins Dep.), at 47:18–19 (emphasis added), then subsequently struck him for a second time with the ASP baton in the back, *see* Pl.'s Objection ¶ 18. Moreover, the parties also dispute whether or not Officer Ahktar observed Officer Willis use pepper spray on Plaintiff before Officer Ahktar struck Plaintiff with his ASP baton in the scene captured in Defendants' Exhibit G. *See* Defs.' Mot., Ex. G, at (00:04–06). Officer Ahktar has testified that he was unaware of the pepper spray use before he struck Plaintiff with the ASP baton. *See* Defs.' Stmt. ¶ 23; Defs.' Mot., Ex. A (Ahktar Dep.), at 116–117. Plaintiff disputes this fact, however, presenting deposition testimony indicating that Officer Ahktar struck him only *after* Plaintiff was pepper sprayed by Officer Willis. *See* Pl.'s Objection ¶ 21; Pl.'s Opp'n, Ex. 13, (Wilkins Dep.), at 55–56.

In sum, the parties dispute whether or not the strike captured at (00:04–06) in Defendants' Exhibit G was (1) the only baton strike against Plaintiff, (2) whether that strike was to Plaintiff's back or legs, and (3) whether Officer Ahktar was aware of the use of pepper spray against Plaintiff before deploying this strike. *See* Pl.'s Objection ¶ 18. And despite the parties' assertions to the contrary, the video footage in the record does not resolve these disputes. Defendants' Exhibit G provides the best vantage point of these events, but even this video is inconsistently focused and,

ultimately, inconclusive.  As such, these facts remain in dispute at this stage of the litigation.

### III.   LEGAL STANDARDS

#### A.  Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and [that he] is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  The mere existence of some factual dispute is insufficient on its own to bar summary judgment; the dispute must pertain to a "material" fact.  *Id.*  Accordingly, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Nor may summary judgment be avoided based on just any disagreement as to the relevant facts; the dispute must be "genuine," meaning that there must be sufficient admissible evidence for a reasonable trier of fact to find for the non-movant.  *Id.*

In order to establish that a fact is or cannot be genuinely disputed, a party must (a) cite to specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of his position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute.  FED. R. CIV. P. 56(c)(1).  Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment.  *Ass'n of Flight Attendants–CWA, AFL–CIO v. U.S. Dep't of Transp.*, 564 F.3d 462, 465–66 (D.C. Cir. 2009).  Moreover, where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the district court may "consider the fact undisputed for purposes of the motion." FED. R. CIV. P. 56(e).

When faced with a motion for summary judgment, the district court may not make credibility determinations or weigh the evidence; instead, the evidence must be analyzed in the light most favorable to the non-movant, with "all justifiable inferences drawn in his favor." *Liberty Lobby*, 477 U.S. at 255.   If material facts are genuinely in dispute, or undisputed facts are susceptible to divergent yet justifiable inferences, summary judgment is inappropriate. *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009).   In the end, the district court's task is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251–52.   In this regard, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50 (internal citations omitted).

## B.  Qualified Immunity

Officers are entitled to qualified immunity "under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).  "'Clearly established' means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Wesby*, 138 S. Ct. at 589 (quotations omitted).  "In other words, existing law must have placed the constitutionality of the officer's conduct beyond debate." *Id.* (quotation omitted).  "This demanding standard protects 'all but the plainly incompetent or those who knowingly violate the law.'"  *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  "A

defendant must first raise the defense of qualified immunity . . . but once asserted, the burden of proof falls to the plaintiff to show that the official is not entitled to qualified immunity." *Campbell v. District of Columbia*, 245 F. Supp. 3d 78, 85 (D.D.C. 2017) (quotation omitted).

## IV.   DISCUSSION

Plaintiff raises nine individual claims, collectively against Defendants.[3]  These claims arise under both federal law and the common law.  Specifically, Plaintiff asserts four constitutional claims under 42 U.S.C § 1983: Excessive Force (Count VI), False Arrest (Count VII), Fabrication of Evidence (Count VIII), and Retaliatory Arrest (Count IX).  Plaintiff also asserts five parallel claims at common law: Assault (Counts I and II), False Arrest (Count III and IV), and Malicious Prosecution (Count V).  Because subject matter jurisdiction in this case derives from Plaintiff's federal causes of action, *see* 28 U.S.C. § 1331, the Court will address those claims first.  The Court will then turn to Plaintiff's common law claims.

### PLAINTIFF'S FEDERAL CLAIMS UNDER § 1983

### A.  False Arrest (Count VII)

Plaintiff first asserts a false arrest claim against Defendants as a constitutional tort under § 1983.  *See* Am. Compl. ¶¶ 91–95.  Such a constitutional claim for false arrest derives from the Fourth Amendment and its prohibition of unreasonable searches and seizures.  *See Wesby*, 138 S. Ct. at 584.  Consequently, the applicable analysis turns on the question of probable cause, as "the focal point of the action is the question whether the arresting officer was justified in ordering the arrest of the plaintiff[.]"  *Scott v. District of Columbia*, 101 F.3d 748, 754 (D.C. Cir. 1996).

#### 1.  Facts Leading To Plaintiff's Arrest

The events leading to Plaintiff's arrest began when Officers Ahktar and Reynolds,

---

[3] Plaintiff voluntarily dismissed his *Monell* claim for municipal liability against the District of Columbia, in Count X of the Amended Complaint.  *See* Not. of Dismissal, ECF No. 18.

responding to a request for assistance, arrived at Gallery Place to support Officers Coffey and Willis. Upon their arrival, Officers Coffey and Willis were detaining Mr. Horton Smith-Shearer after his unprovoked assault on a pedestrian. *See* Def.'s Mot, Ex. O, at (00:10–30). As Officer Coffey secured Mr. Horton Smith-Shearer, a frenzied and hostile crowd comprising at least twenty bystanders encircled her and Officer Willis. *See id.*; *id.*, Ex. N, at (01:30–2:05); Defs.' Stmt. ¶¶ 7–8. Indeed, a number of bystanders moved *towards* the arrest scene and shouted vulgarities at Officers Willis and Coffey. *See* Def.'s Mot, Ex. O, at (00:10–55); *id.*, Ex. N, at (01:30–2:05). Consequently, Officers Reynolds and Ahktar attempted to separate the surrounding crowd from the arrest scene. *See* Defs.' Stmt. ¶ 6. For example, the video evidence depicts Officer Ahktar shouting "back up," while attempting to direct bystanders in this crowd away from his fellow officers. *See* Defs.' Mot., Ex. O, at (01:00–25); *see also* Pl.'s Opp'n, Ex. 11 (Coffey Dep.), at 60:18–22. In his deposition, Plaintiff acknowledged that Officer Akhtar was shouting "back up." Defs.' Mot., Ex. D (Wilkins Dep.), at 47:17.

During this crowd control effort, a serious physical altercation erupted between Officer Reynolds and a bystander, Mr. Joseph Johnson. *See id.*, Ex. E, at (16:24:08–14). At the outset of this altercation, the video evidence depicts Plaintiff standing only feet away from Officer Reynolds. *See id.*, Ex. E, at (16:24:00–10); *id.*, Ex. F. Plaintiff also admits that he was criticizing Officer Reynolds as he engaged with Mr. Johnson, stating: "Yo, you can't do that. That's weak. You can't do that. You can't hit him." *Id.*, Ex. D (Wilkins Dep.), at 47:13–48:1. Officer Ahktar, according to his testimony, then witnessed Plaintiff attempt to assault Officer Reynolds by "swinging on his back area," while he was physically subduing Mr. Johnson on the ground. *Id.*, Ex. A (Akhtar Dep.), at 103:6–104:2. Officer Willis also testified that he saw Plaintiff "swing at [Officer Reynolds] or do something in the nature to . . . distract his attention." *Id.*, Ex. C (Willis

Dep.), at 83:13–84:6.  Plaintiff denies swinging at Officer Reynolds.

Following these events, the video evidence depicts Officer Ahktar walking directly towards Plaintiff.  *See id.*, Ex. G, at (00:00–04).  The video also shows Officer Ahktar shouting a command at Plaintiff and directing him away from Officer Willis and Officer Coffey, who were both restraining arrestees at the time.  *Id.*  Nonetheless, Plaintiff did not immediately comply with Officer Ahktar's request to step back.  *Id.*  Instead, Plaintiff leaned forward aggressively and shouted at Officer Ahktar while clenching his fists.  *Id.*; *see also id.*, Ex. I.  And even after Officer Ahktar presented the threat of his ASP baton, the video shows that Plaintiff continued his confrontational stance towards Officer Ahktar.  *See id.*, Ex. G, at (00:00–04).  Officer Willis, located feet away, observed this confrontation and ultimately deployed pepper spray to subdue Plaintiff.  *See id.*, Ex. G, at (00:04–06).  In response, Plaintiff lifted his hand to push Officer Willis' arm away.  *See id.*  Seconds later, Officers Ahktar and Sergeant Martello performed a takedown of Plaintiff and detained him.  *See id.*, Ex. G, at (00:04–10); *id.*, Ex. L (Martello Dep.), at 44–45.

## 2.  Probable Cause Analysis

The Court will now consider whether the undisputed facts in the record, specifically excluding consideration of those facts in dispute, provided probable cause for Plaintiff's arrest.  A defendant can defeat a constitutional false arrest claim under § 1983 if "the arresting officer had probable cause to believe that the arrestee committed a crime."  *Reiver v. District of Columbia*, 925 F. Supp. 2d 1, 7 (D.D.C. 2013) (quoting *Scott*, 101 F.3d at 754).  Probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity."  *Wesby*, 138 S. Ct. at 586 (quotation omitted).  Indeed, "[p]robable cause is not a high bar."  *Id.*  "To determine whether an officer had probable cause for an arrest, [courts] examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an

objectively reasonable police officer, amount to probable cause." *Id.*

Here, Defendants argue that the facts in this case supported probable cause to arrest Plaintiff under the District of Columbia's Assault on a Police Officer ("APO") statute. *See* D.C. Code § 22–405(b) (2015); Defs.' Mot. at 6–11. Under the APO statute in effect at the time of Plaintiff's arrest, anyone who, "without justifiable and excusable cause, assaults, resists, opposes, impedes, intimidates, or interferes with a law enforcement officer on account of, or while that law enforcement officer is engaged in the performance of his or her official duties shall be guilty of a misdemeanor[.]" D.C. Code § 22–405(b) (2015); *see also Kyle v. Bedlion*, 177 F. Supp. 3d 380, 396 (D.D.C. 2016). District of Columbia courts addressing this APO statute have explained that a violation occurs where the defendant's actions "cross the line into active confrontation, obstruction or other action directed against an officer's performance in the line of duty." *Bedlion*, 177 F. Supp. 3d at 396 (quoting *Howard v. United States*, 966 A.2d 854, 856 (D.C. 2009)). "The 'key is the active and oppositional nature of the conduct for the purpose of thwarting a police officer in his or her duties.'" *Id.*

When evaluating whether Plaintiff's conduct here was sufficiently "active and oppositional," the reasoning in *Cheek v. United States*, 103 A.3d 1019 (D.C. 2014), is instructive. In *Cheek*, two MPD officers were investigating a fight that occurred between two girls on a Washington, D.C. street, amidst a "large, disorderly crowd of 20–30 people." *Id.* at 1020. After one of the officers arrested a girl involved in the fight, Edwin Cheek "approached the officer, yelling at him, cursing, and staggering, upset over how the officer had treated the woman." *Id.* As he advanced, Mr. Cheek "was within ten feet of the officer and repeatedly disregarded his orders to back up." *Id.* at 1021. Mr. Cheek left momentarily, but then "angrily returned to the already 'contentious' scene and repeated the conduct." *Id.* The officers then arrested Mr. Cheek "for

interfering with the investigation," and a trial court subsequently found him "guilty of one count of misdemeanor assault on a police officer ("APO"), in violation of D.C. Code § 22–405(b)." *Id.* at 1020.

On these facts, the District of Columbia Court of Appeals affirmed Mr. Cheek's APO conviction.  Notably, the court found that Mr. Cheek's verbal confrontation was not merely "passive," but rather was "active and oppositional as he repeatedly and aggressively came at [the officer] from behind in the midst of an angry mob, despite repeated orders not to do so."  *Id.* at 1021–22.  In its analysis, the court also highlighted that the arresting officer "felt 'threatened' and 'distracted,' and was concerned for his safety, that of his partner, and the girl he had in handcuffs."  *Id.* at 1021.  Accordingly, the Court reasoned that "the officer's ability to ensure [their] safety and conduct an investigation of the fight was severely impeded by [Mr. Cheek's] repeated conduct."  *Id.*

The facts of the present case are substantially similar to those in *Cheek*.  As in *Cheek*, the events precipitating Plaintiff's arrest involved a violent altercation occurring in a public place with a large and hostile crowd present.  And, like Mr. Cheek, Plaintiff affirmatively positioned himself only feet away from a police officer (here Officer Reynolds), as the officer was physically engaged with another arrestee (here Mr. Johnson).  Also like Mr. Cheek, Plaintiff acknowledges that he was directing criticism towards Officer Reynolds as this arrest was ongoing.  Then, as the video evidence shows, Plaintiff subsequently confronted another officer, Officer Ahktar, despite Officer Ahktar's instructions to move away from the arrest scene.  And during this time, the video also shows Plaintiff yelling, clenching his fists, and leaning towards Officer Ahktar in an aggressive posture.  *See* Defs.' Mot., Ex. G, at (00:00–00:03).  Given that similar conduct supported a *conviction* under the APO statute in *Cheek*, the Court concludes that Plaintiff's confrontational

conduct here supplied probable cause for his arrest under that same statute.  *See Wesby*, 138 S. Ct. at 586 (noting that probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity") (quotation omitted).  Moreover, the Court reaches this conclusion even setting aside the disputed facts regarding whether or not Plaintiff "swung" at Officer Reynolds before his arrest.  *See* FED. R. CIV. P. 56(c)(1); *see also Smith v. United States*, 121 F. Supp. 3d 112, 122 (D.D.C. 2015), *aff'd*, 843 F.3d 509 (D.C. Cir. 2016) ("Smith need not actually have touched Rogers to be convicted of assault on a police officer . . . ").

Finally, the Court notes that this finding of probable cause applies to each of the officers who arrested Plaintiff.  While Plaintiff's Amended Complaint does not specify which officers arrested him, *see* Am. Compl. ¶¶ 74, 92 (noting only that "[o]ne or more of the defendant officers arrested Mr. Wilkins without probable cause"), Plaintiff's opposition focuses on Officer Ahktar and Officer Willis, *see* Pl.'s Opp'n at 8–18.  Both Officer Ahktar and Officer Willis, however, directly observed the probable cause events described above.  The video evidence shows that they were physically present during the struggle between Officer Reynolds and Mr. Johnson and also during Plaintiff's confrontation with Officer Ahktar.  As such, both officers possessed probable cause to arrest Plaintiff under the misdemeanor APO statute.  The Court also notes, however, that Sergeant Martello participated in Plaintiff's arrest.  To the extent Sergeant Martello *did not* observe the relevant probable cause events, the video evidence shows that Sergeant Martello only became involved with Plaintiff after coming to assist Officers Willis and Ahktar.  *See* Defs.' Mot., Ex. G, at (00:10–20); *id.*, Ex. L (Martello Dep.), at 42.  Consequently, a finding of probable cause for Plaintiff's arrest may be imputed to Sergeant Martello.  *See United States v. Hawkins*, 595 F.2d 751, 752 n.2 (D.C. Cir. 1978) ("[P]robable cause may emanate from the collective knowledge of the police, though the officer who performs the act of arresting or searching may be far less

15

informed.").

For the reasons set forth above, the Court concludes that Defendants possessed probable cause to arrest Plaintiff under the misdemeanor APO statute. The presence of this probable cause alone is fatal to Plaintiff's § 1983 claim for false arrest. *See Reiver*, 925 F. Supp. 2d at 7.[4] Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment as to Count VII of the Amended Complaint.

## B. Retaliatory Arrest (Count IX)

In Count IX of the Amended Complaint, Plaintiff asserts a related claim for retaliatory arrest in violation of his First Amendment rights. *See* Am. Compl. ¶¶ 102–105. The Supreme Court has recently explained, however, that "[t]he plaintiff pressing a retaliatory arrest claim must plead and prove the absence of probable cause for the arrest." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1724 (2019). As explained in detail in Section IV.A.2, however, Plaintiff has not shown the absence of probable cause for his arrest here. This alone defeats his claim and renders summary judgment as to Count IX appropriate. *See, e.g.*, *Hinkle v. Beckham Cty. Bd. of Cty. Commissioners*, 962 F.3d 1204, 1227 (10th Cir. 2020) ("We have already concluded that Deputy Estep had probable cause to arrest Hinkle. So, under *Nieves*, Hinkle's retaliatory-arrest claim must fail."); *Lund v. City*

---

[4] Even if probable cause was lacking, however, Defendants would still be entitled to qualified immunity for Plaintiff's § 1983 claim of false arrest. "Qualified immunity shields officers from suit for false arrest when, 'in light of clearly established law and the information the [arresting] officers possessed,' a reasonable officer could have believed the arrest was lawful.'" *Hall v. District Columbia*, 867 F.3d 138, 155 (D.C. Cir. 2017) (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)). Here, the relevant case law "demonstrate[s] the fuzzy parameters of D.C.'s APO crime," *Bedlion*, 177 F. Supp. 397, a development attributable to the fact that each APO case involves "balancing [that] must be conducted, on a case-by-case basis, in an intensely factual analysis," *In re C.L.D.*, 739 A.2d 353, 357 (D.C. 1999). Such ambiguity hardly evinces a clearly established standard that would have placed Defendants on notice of the lack of probable cause for Plaintiff's arrest, and, as noted above, the case presenting the closest factual analogue to the present action weighs *in favor* of the existence of such probable cause. *See Cheek*, 103 A.3d at 1020. Accordingly, the Court does not find that "'controlling authority' or [a] 'robust consensus of cases of persuasive authority' . . . deprive[s] the officers here of the cloak of qualified immunity." *Bedlion*, 177 F. Supp. 398, n.8 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741–42 (2011)).

*of Rockford*, 956 F.3d 938, 944 (7th Cir. 2020) ("[T]he *Nieves* Court answered the only question posed in this case: Does probable cause to make an arrest defeat a claim that the arrest was in retaliation for speech protected by the First Amendment? The answer, the Supreme Court held . . . is 'yes.'").

Moreover, the probable cause supporting Plaintiff's arrest does not fall within the "narrow qualification" carved out by the Supreme Court for "circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so." *Nieves*, 139 S. Ct. at 1727 (providing the example of "jaywalking"). To the contrary, the record shows that Plaintiff's arrest derived from his aggressive and confrontational behavior directed towards police officers within an active arrest scene. *See* disc. *supra* at Section IV.A.2. And Plaintiff's opposition cites no record evidence indicating that Plaintiff's arrest occurred in response to his First Amendment speech, rather than to the ongoing public safety concern Defendants encountered. *See* Pl.'s Opp'n at 45; *Hartman v. Moore*, 547 U.S. 250, 260 (2006). For these reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment as to Count IX of the Amended Complaint.

## C. Excessive Force (Count VI)

Plaintiff also asserts an excessive force claim under § 1983. *See* Am. Compl. ¶¶ 84–90. Courts evaluate such claims of excessive force against a familiar standard: whether the officer's use of force was objectively reasonable under the circumstances. *See Cty. of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1546–47 (2017). In assessing the reasonableness of an officer's use of force, the Court considers "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Moreover, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often

forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

Finally, even where the use of force was not objectively reasonable, qualified immunity will still shield an officer so long as the force did not violate clearly established law. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). In light of this qualified immunity, a motion for summary judgment "is to be denied only when, viewing the facts in the record and all reasonable inferences derived therefrom in the light most favorable to the plaintiff, a reasonable jury could conclude that the excessiveness of the force is so apparent that no reasonable officer could have believed in the lawfulness of his actions." *Okpara v. District of Columbia,* 174 F. Supp. 3d 6, 14 (D.D.C. 2016) (quoting *DeGraff v. District of Columbia*, 120 F.3d 298, 302 (D.C. Cir. 1997)). Courts evaluating an excessive force claim possess "discretion to consider th[is] second prong of the qualified-immunity analysis first." *Bedlion*, 177 F. Supp. 3d at 390 (citing *Pearson*, 555 U.S. at 236). The Court will do so here.

### 1. Officer Ahktar's Use Of The ASP Baton

Plaintiff first predicates his excessive force claim upon Officer Ahktar's use of an ASP baton to strike him. *See* Pl.'s Opp'n at 3–4. To assess this claim, the Court begins with the video evidence in the record. *See Scott*, 550 U.S. at 381. This video evidence shows Officer Ahktar brandish his ASP baton in an attempt to separate Plaintiff from Officers Willis, Coffey, and Johnson, all of whom had detained arrestees at the time. *See* Defs.' Mot., Ex. G, at (00:00–04); Defs.' Stmt. ¶¶ 2–9. Plaintiff, however, continued to confront Officer Ahktar, even after Officer Ahktar attempted to remove Plaintiff from the arrest scene. *See* Defs.' Mot., Ex. G, at (00:00–04). Then, during this confrontation, the video shows Officer Willis use pepper spray on Plaintiff. *See id.*, Ex. G, at (00:05–06). In response, Plaintiff raises his arm to push Officer Willis' right hand

out of the way. *Id.* At this moment, the video briefly pans away from Officer Ahktar, but then returns to show Officer Ahktar in a crouched position, ostensibly following through with a baton strike to Plaintiff. *Id.* There is no other baton strike captured on video.

Notwithstanding this video evidence, the parties espouse divergent factual accounts of how, precisely, Officer Ahktar deployed his ASP baton against Plaintiff. To start, Plaintiff alleged in his Amended Complaint that Officer Ahktar "struck him with a police billy club." Am. Compl. ¶ 19. This singular strike referenced in the pleadings appears to comport with the baton strike captured in the video record. *See* Defs.' Mot., Ex. G, at (00:04–06). In his deposition, however, Plaintiff further explained that Officer Ahktar struck him "a bunch of times" on his legs. *See* Pl.'s Opp'n, Ex. 13 (Wilkins Dep.), at 47:18–19; *see also* Pl.'s Objection ¶ 18. And Plaintiff now asserts in his opposition that this "bunch" of strikes occurred *before* the video evidence begins, and the strike captured on video was, in fact, a "second" strike to his back. *See* Pl.'s Opp'n at 3–4; Pl.'s Objection ¶ 18. Defendants argue, in turn, that the video evidence in the record captures the only (singular) baton strike Officer Ahktar deployed against Plaintiff. *See* Defs.' Mot. at 19. In light of this factual dispute and the absence of clear video evidence, the Court will consider Officer Ahktar's baton strikes in two parts, as Plaintiff alleges. *See Liberty Lobby*, 477 U.S. at 255.

### a.  Officer Ahktar's Alleged Baton Strikes To Plaintiff's Legs

First, the Court considers the factual scenario surrounding Officer Ahktar's "bunch" of leg strikes, which Plaintiff alleges occurred *before* a second strike to his back. At the time Plaintiff alleges these initial strikes occurred, the record shows that Officer Ahktar was attempting to secure a public arrest scene, proximate to a physical altercation which had erupted between Officer Reynolds and Mr. Johnson. *See* Defs.' Mot., Ex. O, at (0:01:05–25). Moreover, the video evidence in the record shows that Plaintiff was positioned only feet away from this activity, *see id.*, Ex. I,

and Officer Ahktar testified that he believed Plaintiff had swung at Officer Reynolds's back, *see id.*, Ex. A (Akhtar Dep.), at 103:6–104:2.  Plaintiff also admits that he was criticizing Officer Reynolds at the time, stating: "Yo, you can't do that. That's weak. You can't do that. You can't hit him."  *Id.*, Ex. D (Wilkins Dep.), at 47:13–48:1.  And throughout this transaction, Plaintiff remained unrestrained, while the four MPD officers on the scene were encircled by a large and hostile crowd, comprising at least twenty bystanders. *See id.*, Ex. E, at (16:24:08–14); Defs.' Stmt. ¶¶ 7–8.  Moreover, if, as Plaintiff alleges, these initial leg strikes occurred *before* the "second" strike caught on video, then video evidence clearly shows that Plaintiff was able to maintain an active and confrontational stance, even *after* these initial strikes were deployed.  *See* Defs.' Mot., Ex. G, at (00:00–04).

On these facts, the Court has found no authority from the Supreme Court, the D.C. Circuit, or from a robust consensus of courts that would have given notice to a reasonable officer in Officer Ahktar's position that these alleged baton strikes against Plaintiff were unreasonable.  *See Bedlion*, 177 F. Supp. 3d at 393 (citing *Johnson v. District of Columbia*, 528 F.3d 969, 976 (D.C. Cir. 2008)).  As an initial matter, Plaintiff's opposition presents no controlling precedent that squarely places Officer Ahkatr's baton strikes outside the bounds of reasonableness.  *See* Pl.'s Opp'n at 24–27.  Here, Plaintiff's most applicable authorities on the question of excessive force are *Johnson v. District of Columbia*, 528 F.3d 969 (D.C. Cir. 2008), and *Arrington v. United States*, 473 F.3d 329 (D.C. Cir. 2006).  But both cases are, ultimately, inapposite.  In *Arrington*, the record showed that the officers not only struck the arrestee with a baton, but also employed pistol-whipping, a police dog, and physical strikes over an extended period of time, even where the arrestee was handcuffed.  *See Arrington*, 473 F.3d at 336.  And in *Johnson*, the officer kicked the arrestee in the groin while he lay "on his belly with arms and legs spread," held at gun point.  *See Johnson*, 528 F.3d at 974.

20

Such fact patterns are distinct from this case.  Here, Officer Ahktar's alleged "bunch" of strikes to Plaintiff's legs are far less intrusive, they occurred in the midst of a chaotic arrest scene, and it is undisputed in the record that Plaintiff was not restrained, subdued, or handcuffed at the time of these strikes.

Furthermore, a number of existing authorities indicate that Officer Ahktar's alleged use of force *was*, in fact, reasonable.  In *Wardlaw v. Pickett*, 1 F.3d 1297 (D.C. Cir. 1993), for example, the D.C. Circuit held that no reasonable jury could find excessive force where an officer had punched an unrestrained man approaching an arrest scene, "once in the jaw and two or three times in the chest."  *Id.* at 1300, 1304.  The Court also finds the decision in *Westfahl v. District of Columbia*, 75 F. Supp. 3d 365 (D.D.C. 2014), instructive.  There, Judge Christopher Cooper held that an officer was protected by qualified immunity where he deployed baton strikes against a man who was not yet restrained, was confronting a fellow officer, and did not receive significant injuries from the blows.  *Id.* at 373.  Such fact patterns mirror Plaintiff's case and weigh against the conclusion that Officer Ahktar's initial baton strikes violated clearly established law.  Accordingly, the Court finds that Officer Ahktar is protected by qualified immunity from claims deriving from his alleged initial leg strikes against Plaintiff.  *See Kisela v. Hughes,* 138 S. Ct. 1148, 1153 (2018) ("[P]olice officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue.") (quotation omitted).

### b.  Officer Ahktar's "Second" Strike

Next, Plaintiff grounds his excessive force claim on what he alleges was Officer Ahktar's "second" use of the ASP baton against him, this time a strike to Plaintiff's back.  *See* Pl.'s Opp'n at 4; Pl.'s Objection ¶ 18.  As Plaintiff acknowledges, this specific strike is captured by video evidence in the record.  *See* Pl.'s Opp'n at 4 (citing Defs.' Mot., Ex. G, at (00:03–05)).  Upon

review of this video, and viewing all other facts in favor of Plaintiff, the Court concludes that this "second" strike is also not violative of clearly established law.

Specifically, the video evidence depicts three critical facts occurring before the alleged "second" baton strike.  First, the video shows Plaintiff yelling at Officer Ahktar, while leaning forward aggressively with clenched fists.  *See* Defs.' Mot., Ex. G, at (00:00–07).  Second, the video depicts Officer Ahktar attempting to separate Plaintiff from Officers Willis and Coffey, who each were in custody of struggling arrestees at the time.  *Id.*  And, finally, the video shows that Plaintiff physically pushed Officer Willis' hand as he deployed pepper spray.  *Id.*  Even crediting Plaintiff's factual assertion that Officer Ahktar witnessed this use of pepper spray against Plaintiff by Officer Willis, *see* Pl.'s Objection ¶ 21; *see also* Pl.'s Opp'n at 32, the video evidence still demonstrates Officer Ahktar's real-time reaction to a sudden physical altercation between Plaintiff and Officer Willis, who at the moment was detaining another individual, *see* Defs.' Mot., Ex. G, at (00:00–07).

Given these facts, a reasonable officer would not have been on notice that single baton strike used to "subdue" Plaintiff was unlawful.  *Id.*, Ex. A, (Akhtar Dep.), at 103:3–5; *see also* Defs.' Stmt. ¶ 20.  As in prior cases where such force was deemed reasonable, Officer Ahktar encountered a dynamic arrest scene, a hostile crowd, and a confrontational, unrestrained bystander. A reasonable officer under these circumstances would not have been on notice that a single baton strike to the back was objectively unreasonable.  *See, e.g.*, *Wardlaw*, 1 F.3d at 1304; *Westfahl*, 75 F. Supp. 3d at 373.  Moreover, the Court notes that Plaintiff's version of the disputed facts only supports this conclusion.  If Officer Ahktar's alleged second strike did occur *after* an initial confrontation with Officer Ahktar had already taken place, *see* Pl.'s Objection ¶ 18, then Plaintiff presented an even greater obstacle of persistent confrontation to the officers at the time of the alleged "second" strike, further supporting the reasonableness of this strike, *see* Defs.' Mot., Ex.

G, at (00:00–07).  For these reasons, Officer Ahktar is also shielded by qualified immunity from liability arising from this "second" baton strike.

### 2.  Officer Willis' Use Of The OC ("Pepper") Spray

Next, Plaintiff argues that Officer Willis' use of pepper spray on Plaintiff constituted excessive force.  *See* Pl.'s Opp'n at 27–30.  As noted above, the parties dispute certain events that preceded this use of pepper spray, such as whether or not Plaintiff swung at Officer Reynolds before confronting Officer Ahktar.  *See* Pl.'s Objection ¶ 14.  Nonetheless, the video evidence in the record clearly captures Officer Willis' use of pepper spray against Plaintiff and the immediate events surrounding this use of force.  *See* Defs.' Mot., Ex. G, at (00:00–10).  And even crediting Plaintiff's account of the factual disputes at the summary judgment stage, the clear video evidence in the record is dispositive of this excessive force claim.  *See Harris*, 550 U.S. at 381.

First, it is undisputed that, before Officer Willis deployed the pepper spray, he had detained an assault suspect, Mr. Horton Smith-Shearer, and then arrested a second individual, Mr. Favors. It is also undisputed that a large and hostile crowd had surrounded the officers as these arrests proceeded.  *See* Defs.' Stmt. ¶ 8; Pl.'s Objection ¶ 8; *see* Defs.' Mot., Ex. O, at (00:20–01:20). Then, in the moments directly leading up to the use of pepper spray, the video evidence shows that Officer Ahktar attempted to separate Plaintiff from Officers Willis and Coffey, both of whom currently had individuals in custody.  *See* Defs.' Mot., Ex. G, at (00:00–10).  Plaintiff did not immediately step away from Officer Ahktar, however, but instead confronted Officer Ahktar while clenching his fists and leaning forward aggressively.  *Id.*  As that confrontation proceeded, Officer Willis then intervened and used his right hand—he was using his left hand to restrain Mr. Favors— to eject pepper spray into Plaintiff's face from close range.  *Id.*

As Defendants note, "[n]o D.C. Circuit case has held that the use of [pepper] spray on an

assaultive, uncuffed suspect is a constitutional violation."  Defs.' Mot. at 18.  Indeed, Plaintiff does not identify any controlling authority that would have placed a reasonable officer on notice that such a use of pepper spray was objectively unreasonable.  *See* Pl.'s Opp'n at 27–30.  In turning to other circuits throughout the country, however, a governing principle does emerge: the use of pepper spray becomes unreasonable where it is deployed against a restrained and compliant individual.  *See, e.g.*, *Lennox v. Miller*, 968 F.3d 150, 157 (2d Cir. 2020) ("[N]o reasonable officer could have believed that he was entitled to use pepper spray gratuitously against a restrained and unresisting arrestee.") (quotation omitted); *Henry v. City of Flint, Mich.*, 814 F. App'x 973, 983 (6th Cir. 2020) ("[T]he use of pepper spray to induce compliance in a suspect who was trying to get away from the arresting officers was not clearly excessive."); *Jackson v. City of Bremerton*, 268 F.3d 646, 652–53 (9th Cir. 2001) (holding that use of pepper spray was reasonable given individual's active interference with officers).

Under this governing principle, the Court does not find that Officer Willis' use of pepper spray violated clearly established law.  Here, the video evidence shows that Plaintiff was neither restrained nor compliant with Officer Ahktar in the moments leading up to Officer Willis' use of the pepper spray.  *See* Defs.' Mot., Ex. G, at (00:00–10).  Moreover, Officer Willis' police work must be viewed in the context of the "rapidly evolving" scene around him at the time.  *Graham*, 490 U.S. at 396–97.  As Plaintiff confronted Officer Ahktar, Officer Willis was detaining another arrestee, and therefore had only one free hand available to address the obstacle Plaintiff posed.  *See* Defs.' Mot., Ex. G, at (00:00–10).  Furthermore, the crowd encircling Officer Willis at the time remained large and hostile, leaving an uncertain public safety environment that was not yet secure.  *Id.*  These specific facts distinguish Officer Willis' use of pepper spray from a case wherein the arrestee has been secured and presented no major security threat.  *See Kisela*, 138 S. Ct. at 1153

("[P]olice officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue.").  Accordingly, Officer Willis' use of pepper spray against Plaintiff did not violate clearly established law and, therefore, Officer Willis retains qualified immunity.

### 3.  The "Take Down" Maneuver

Finally, Plaintiff grounds his excessive force claim in the "take down" maneuver used against him, following Officer Willis' use of pepper spray.  *See* Am. Compl. ¶ 20; Pl.'s Opp'n at 33–36.  This "take down" maneuver is captured clearly on video from multiple vantage points. And there is no question that this video evidence reveals some physical force involved in the take down maneuver performed by Defendants.  Nonetheless, the Court finds that *Hedgpeth v. Rahim*, 893 F.3d 802 (D.C. Cir. 2018), is squarely on point and forecloses Plaintiff's claim.

In *Hedgpeth*, two MPD officers approached Mr. Jonathan Hedgpeth, outside of a bar on March 2, 2015.  *Id.* at 805.  Mr. Hedgpeth was accompanied by a friend, Marcus Lee, at the time. *Id.*  The officers began to ask Mr. Hedgpeth questions regarding "reports of someone going up and down the street hitting others."  *Id.*  Mr. Hedgpeth was uncooperative—he refused to answer direct questions, was slurring his words, and was hesitant in producing his identification.  *Id.*  In response to this recalcitrance, the officers "warn[ed] [Mr.] Hedgpeth several times to calm down," but eventually "told him he was under arrest."  *Id.*

Following this command, the confrontation between the officers and Mr. Hedgpeth became physical and a take down ensued:

> Hedgpeth began to scream, shouting that he had done nothing wrong and demanding to be let go. Officer Rahim ordered Hedgpeth to put his arms behind his back, but Hedgpeth did not comply. After Officer Rahim repeated his order multiple times, he reached for Hedgpeth's left arm. Officer Rahim also used his knee to push the back of Hedgpeth's leg and take him down to the ground. As Hedgpeth fell, his head struck the grid of the paned window of the bar. With Hedgpeth on the ground, Officer Rider grabbed his arm and the officers handcuffed him. As a result of his head hitting the window, Hedgpeth suffered a concussion, headaches, vertigo, and other post-concussive symptoms.

*Id.* On these facts, the D.C. Circuit found that the officers had not "violated clearly established law in using a takedown maneuver to subdue Hedgpeth," and affirmed the district court's decision to grant summary judgment in favor of the officers, on the basis of qualified immunity.  *Id.* at 810.

Defendants' take down of Plaintiff is similar to the take down at issue in *Hedgpeth*.  As the video evidence in the record depicts, the take down occurred after Plaintiff had been visibly confrontational with Officer Ahktar, and after Plaintiff physically pushed back against Officer Willis, during his deployment of pepper spray.  *See* Defs.' Mot., Ex. G, at (00:04–15).  Plaintiff then walked away from the scene, until Officer Willis pursued Plaintiff and attempted to put his hands behind his back.  *Id.*  The video then shows a slight physical struggle between Plaintiff and Officers Willis, Ahktar, and Sergeant Martello transpire, until Officer Ahktar and Sergeant Martello finally performed the take down maneuver, forcing Plaintiff onto the ground.  *Id.*; *see also id.*, Ex. L (Martello Dep.), at 44–45.   The video evidence shows that Plaintiff was bleeding from the face after the take down, *see id.*, Ex. K, at (00:05–15), and Plaintiff contends that his tooth was also injured, *see* Pl.'s Opp'n, at 34.

Plaintiff argues that this take down was unreasonable, particularly because he had just been pepper sprayed.  *See id.* at 34–36.  It is true that use of pepper spray distinguishes Plaintiff's case from the facts of *Hedgpeth*, but offsetting factors are present as well.  For example, even after the pepper spray, the video evidence shows Plaintiff still unrestrained and physically resisting the officers.  *See* Defs.' Mot., Ex. G, at (00:04–15).  Moreover, the need to secure Plaintiff in this case was more significant than in *Hedgpeth*, as Plaintiff's arrest occurred amidst a frenzied crowd where an assault had just occurred and where multiple arrests had transpired.  Additionally, the take down of Plaintiff appears *less violent* than the take down at issue in *Hedgpeth*.  Notably, the officers in this case took Plaintiff down on his back, and while Plaintiff sustained some facial injuries, they

26

appear much less severe than the concussive injuries Mr. Hedgpeth sustained after forcefully striking his head against a window.  *See Hedgpeth*, 893 F.3d at 805.

In view of these facts, the Court cannot conclude that the take down performed here was less reasonable than the take down performed in *Hedgpeth*.  Consequently, the Court is compelled to find that all Defendants are shielded by qualified immunity for the take down of Plaintiff, as were the officers in *Hedgpeth*.  The Court's decision is also guided by the Supreme Court's instruction to make "allowance[s] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  *Graham*, 490 U.S. at 397.  While the Court acknowledges Plaintiff's injuries, it is constrained by this binding precedent from the Supreme Court and the D.C. Circuit.  Because Defendants' take down of Plaintiff did not violate clearly established law, Defendants are shielded by qualified immunity.

For the reasons set forth above, Defendants are all entitled to qualified immunity as to Plaintiff's excessive force claim under § 1983.  Accordingly, the Court **GRANTS** Defendant's Motion for Summary Judgment as to Count VI of the Amended Complaint.

## D.  Fabrication Of Evidence (Count VIII)

Finally, Plaintiff argues that Officer Ahktar violated his constitutional rights by including fabricated evidence in Plaintiff's arrest report and providing that falsified report to federal prosecutors.  *See* Am. Compl. ¶¶ 96–101; Pl.'s Opp'n at 36–44.[5]  In relevant part, this arrest report

---

[5] Count VIII of the Amended Complaint asserts this fabrication-of-evidence claim specifically against Officer Ahktar.  *See* Am. Compl. ¶¶ 96–101.  In his opposition brief, however, Plaintiff ostensibly expands this fabrication claim to reach Officers Willis and Reynolds as well.  *See* Pl.'s Opp'n at 40.  "It is a well-established principle of law in this Circuit that a plaintiff may not amend h[is] complaint by making new allegations in h[is] opposition brief."  *Budik v. Ashley*, 36 F. Supp. 3d 132, 144 (D.D.C. 2014), *aff'd sub nom. Budik v. United States*, No. 14-5102, 2014 WL 6725743 (D.C. Cir. Nov. 12, 2014); *see also Wright v. United States Dep't of Justice*, 121 F. Supp. 3d 171, 183 (D.D.C. 2015) ("[I]t is inappropriate for a Court to consider new claims raised for the first time in a brief in opposition to a motion for summary judgment.").

stated:

> As Officer Reynolds was struggling to place defendant Johnson in handcuffs, a black male, later identified as [Plaintiff] swung at Officer Reynolds back area with a closed fist. Officers Ahktar and Willis then attempted to detain defendant Wilkins. Defendant Wilkins continued to ignore officer's commands and took a fighting stance by raising his arms and clinched his fist. A struggle ensued between defendant Wilkins and officers Ahktar and Willis. Defendant continued to pull his hands away from the officers as they attempted to detain him. Defendant Wilkins was finally placed in handcuffs with the help of Sgt Martello.

Pl.'s Mot., Ex. 14 (Arrest Report), at 3. In his deposition, Officer Ahktar testified that he submitted this arrest report to the United States Attorney's Office on the day of Plaintiff's arrest. *See* Pl.'s Opp'n, Ex. 2 (Ahktar Dep.), at 124–125. Officer Ahktar further stated that the designated federal prosecutor made his charging decision against Plaintiff based "on the circumstances, including the arrest report" itself. *See id.*, Ex. 2 (Ahktar Dep.), at 130:4–10. And on March 9, 2016, federal prosecutors charged Plaintiff with a misdemeanor offense for assaulting a police officer, in the case captioned *United States v. Wilkins*, 2016-CMD-003476. *See* Pl.'s Opp'n at 43; *see also id.*, Ex. 15 (Docket Sheet). This prosecution lasted over four months and included an arraignment hearing, as well as a trial date. *See* Pl.'s Opp'n at 43; *see also id.* at Ex. 15 (Docket Sheet). Plaintiff contends that this prosecution was motivated by Officer Ahktar's arrest report, which contained falsified information in violation of his constitutional rights.

The Court must first properly frame this constitutional claim. In his Amended Complaint and his opposition brief, Plaintiff presents this fabrication-of-evidence claim as a matter arising under the Fifth Amendment. *See* Pl.'s Opp'n at 41–42. Such an approach comports with prior courts in this jurisdiction, which have evaluated fabrication-of-evidence claims as matters of substantive due process. *See Hall v. District of Columbia*, 308 F. Supp. 3d 269, 274 (D.D.C. 2018); *Molina-Aviles v. District of Columbia*, 824 F. Supp. 2d 4, 9 (D.D.C. 2011); *Bolling v. Sharpe*, 347

---

Accordingly, the Court limits the scope of Count VIII exclusively to Officer Ahktar.

U.S. 497, 499 (1954) (noting the applicability of the Fifth Amendment Due Process Clause to District of Columbia residents). And although the Second Circuit has hinted at a unique "fair trial" claim arising under the Sixth Amendment, *see Garnett v. Undercover Officer C0039*, 838 F.3d 265, 276, n.6 (2d Cir. 2016), a plurality of the circuits consider fabrication-of-evidence claims as matters of substantive due process as well. *See Black v. Montgomery Cty.*, 835 F.3d 358, 369 (3d Cir. 2016); *Winslow v. Smith*, 696 F.3d 716, 736 (8th Cir. 2012); *McConkie v. Nichols*, 446 F.3d 258, 260 (1st Cir. 2006); *Gantt v. City of Los Angeles*, 717 F.3d 702, 707 (9th Cir. 2013). This due process right emanates from the long-acknowledged "principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction." *Napue v. Illinois*, 360 U.S. 264, 269 (1959).

In view of the foregoing, the Court will address Plaintiff's Count VIII as a substantive due process claim for fabrication-of-evidence. "In order to establish [such] a substantive due process claim, a plaintiff must show that the state actor was deliberately indifferent to his constitutional rights such that the conduct shocks the conscience." *Molina-Aviles*, 824 F. Supp. 2d at 9 (quoting *Estate of Phillips v. District of Columbia*, 455 F.3d 397, 403 (D.C. Cir. 2006)). This "shock the conscience" standard sets a high bar and precludes only "government action that is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Ali v. Trump*, 959 F.3d 364, 369 (D.C. Cir. 2020) (citations and quotations omitted). Importantly, "[n]egligence alone is insufficient to establish a [such] claim under § 1983." *Molina-Aviles*, 824 F. Supp. 2d at 10 (citing *Daniels v. Williams*, 474 U.S. 327, 331 (1986)).

Within this framework, Plaintiff's fabrication-of-evidence claim cannot survive summary judgment. At most, the record presents some factual disputes regarding the circumstances of Plaintiff's arrest. Namely, Plaintiff denies that he ever "swung" at Officer Reynolds, *see* Pl.'s

Objection ¶ 12, and has presented deposition testimony supporting that factual position, *see* Pl.'s Opp'n, Ex. 13, (Wilkins Dep.), at 77:4–14.  But even assuming *arguendo* that Plaintiff's disputed account is accurate, such a dispute alone does not indicate that Officer Ahktar "deliberately" fabricated his arrest report.

In the context of a fabrication-of-evidence claim, "testimony that is incorrect or simply disputed should not be treated as fabricated merely because it turns out to have been wrong." *Halsey v. Pfeiffer*, 750 F.3d 273, 295 (3d Cir. 2014).  And the "misleading impression that [a] report may leave as to the order of events demonstrates at most negligence on the part of [the officer], which is insufficient to sustain a fabrication of evidence claim."  *Riddle v. Riepe*, 866 F.3d 943, 948 (8th Cir. 2017).  Instead, Plaintiff must present "persuasive evidence supporting a conclusion that the proponents of the evidence were aware that the [information] was incorrect, and thus, in effect, offered the evidence in bad faith."  *Halsey*, 750 F.3d at 295; *see also Winslow v. Smith*, 696 F.3d 716, 732 (8th Cir. 2012) ("[A] manufactured false evidence claim requires proof that investigators deliberately fabricated evidence in order to frame a criminal defendant.").  Accordingly, "it will be an unusual case in which a police officer cannot obtain a summary judgment in a civil action charging him with having fabricated evidence used in an earlier criminal case."  *Halsey*, 750 F.3d at 295.

The record here simply does not support the level of intentional fabrication necessary to sustain a substantive due process claim.  First, Officers Ahktar and Willis have both testified in this case that Plaintiff appeared to swing at Officer Reynolds' back.  *See* Defs.' Mot., Ex. A (Akhtar Dep.), at 103:6–104:2; *id.*, Ex. C (Willis Dep.), at 83:13–84:6.  This testimony remains consistent with the content of Officer Ahktar's original arrest report.  Moreover, the video evidence clearly shows a chaotic and crowded scene unfold immediately next to Officer Reynolds, as well as

Plaintiff standing feet away from Officer Reynolds at this time.  *See* Def.'s Mot., Ex. E, at

(16:24:00–10); Defs.' Mot., Ex. F.  And Plaintiff has testified that he was directing vocal criticism

towards Officer Reynolds, as Officer Reynolds was arresting Mr. Johnson.  *See id.*, Ex. D (Wilkins

Dep.), at 47:13–48:1.  Furthermore, the arrest report's description of the subsequent "struggle"

between Plaintiff and the officers, does not patently diverge with the video evidence now in the

record.  *See id.*, Ex. G, at (00:00–15).  Such record evidence weighs against any finding of

deliberate manipulation.  Additionally, the record is devoid of any "persuasive evidence" showing

that Officer Ahktar manufactured false facts "in bad faith," so as to "shock the conscience."

*Halsey*, 750 F.3d at 295.  Accordingly, the Court **GRANTS** Defendants' Motion for Summary

Judgment as to Count VIII of the Amended Complaint.[6]

### PLAINTIFF'S COMMON LAW CLAIMS

The Court will next consider Plaintiff's common law claims.  The Court may exercise

supplemental jurisdiction over these common law claims under 28 U.S.C. § 1367(a).  This

jurisdiction is discretionary, however, and § 1367(c) provides that "[t]he district courts may decline

to exercise supplemental jurisdiction over a claim . . . if (1) the claim raises a novel or complex

issue of State law, (2) the claim substantially predominates over the claim or claims over which

the district court has original jurisdiction, (3) the district court has dismissed all claims over which

it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons

---

[6] As noted above, the government dismissed Plaintiff's case in July 2016.  Some courts have rejected
fabrication-of-evidence claims where the prosecution in question did not result in a conviction, reasoning
that no deprivation of liberty ultimately occurred.  *See Saunders-El v. Rohde*, 778 F.3d 556, 561 (7th Cir.
2015).  Judge Richard Leon, writing for this Court, recently dismissed a fabrication-of-evidence claim on
summary judgment where the defendant "was not actually *tried* for his alleged crime because the
Government . . . dropped the case against him."  *Mehari v. District of Columbia*, No. CV 16-1889 (RJL),
2020 WL 1557265, at *4 (D.D.C. Mar. 31, 2020).  The D.C. Circuit, however, has not yet addressed the
question of whether the absence of a conviction negates a fabrication-of-evidence claim and, therefore, the
Court does not rest its disposition of Plaintiff's fabrication-of-evidence claim on this factor.

for declining jurisdiction." *Id.* at § 1367(c)(1)–(4).  For the reasons below, the Court will exercise supplemental jurisdiction over Plaintiff's common law claims for false arrest and malicious prosecution.  The Court, however, will not exercise supplemental jurisdiction over Plaintiff's common law assault claims, and will instead dismiss those claims without prejudice.

### A.  Common Law False Arrest (Counts III and IV)

Plaintiff's common law claims for false arrest mirror his § 1983 claim for false arrest, as "the elements of a constitutional claim for false arrest are substantially identical to the elements of a common-law false arrest claim." *Reiver v. District of Columbia*, 925 F. Supp. 2d 1, 7 (D.D.C. 2013) (quoting *Scott v. District of Columbia*, 101 F.3d 748, 753–54 (D.C. Cir. 1996)).  Of note, the existence of probable cause is equally fatal to both claims.  Specifically, an officer "will have a complete defense to a false arrest claim" at common law, "if a police officer has so-called constitutional probable cause to arrest, determined by reference to the objective standard used to determine probable cause in a criminal proceeding." *Scales v. District of Columbia*, 973 A.2d 722, 729 (D.C. 2009) (quotation omitted).

Because of these overlapping contours, the interests of judicial economy weigh in favor of this Court's exercise of supplemental jurisdiction over Plaintiff's common law false arrest claims. *See Shekoyan v. Sibley Int'l*, 409 F.3d 414, 423–24 (D.C. Cir. 2005).  As described above in Section IV.A.2, undisputed evidence in the record demonstrates that Defendants possessed probable cause for Plaintiff's March 8, 2016 arrest under the District of Columbia's APO statute. *See* D.C. Code § 22–405(b).  This finding of probable cause applies with equal force to Plaintiff's common law false arrest claims and, accordingly, these claims also fail to survive Defendants' Motion for Summary Judgment. *See Amobi v. District of Columbia Dep't of Corr.*, 755 F.3d 980, 989 (D.C. Cir. 2014) ("Constitutional and common law claims of false arrest are generally analyzed as though

they comprise a single cause of action."); *Smith v. United States*, 121 F. Supp. 3d 112, 122 (D.D.C. 2015) (dismissing both common law and constitutional false arrest claims where probable cause existed).  The Court, therefore, **GRANTS** Defendants' Motion for Summary Judgment as to Counts III and IV of the Amended Complaint.[7]

## B. Malicious Prosecution (Count V)

The Court will also exercise its discretion and address Plaintiff's common law claim for malicious prosecution, asserted here against the District of Columbia.  *See* 28 U.S.C. § 1367(a); Am. Compl. ¶¶ 81–83.  "Under District of Columbia law, a plaintiff alleging malicious prosecution must prove (1) a criminal proceeding instituted or continued by the defendant against the plaintiff; (2) termination of the proceeding in favor of the plaintiff; (3) absence of probable cause for the proceeding; and (4) malice, defined as 'a primary purpose in instituting the proceeding other than that of bringing an offender to justice.'"  *Sherrod v. McHugh*, 334 F. Supp. 3d 219, 254–55 (D.D.C. 2018) (quoting *DeWitt v. District of Columbia*, 43 A.3d 291, 296 (D.C. 2012)).  Because "[l]ack of probable cause is an essential element of an action for malicious prosecution," "a showing of probable cause is thus a valid defense which warrants a directed verdict for the defendant." *Ammerman v. Newman*, 384 A.2d 637, 639 (D.C. 1978).

In this case, the United States Attorney's Office did charge Plaintiff with a misdemeanor violation for assault on a police officer.  *See* Pl.'s Opp'n, Ex. 15 (Docket Sheet).  Nonetheless, as set forth in Section IV.A.2, probable cause existed for this charge, and this probable cause defeats Plaintiff's malicious prosecution claim at common law.  *See Ammerman*, 384 A.2d at 639; *see also*

---

[7] Plaintiff's false arrest claim in Count IV of the Amended Complaint rests on a *respondeat superior* theory of liability against the District of Columbia.  *See* Am. Compl. ¶¶ 77–80.  But here, "[s]ince the defendant officers are not liable, neither can their employer, the District of Columbia, be held liable for . . . false arrest under the doctrine of *respondeat superior*."  *Hargraves v. District of Columbia*, 134 F. Supp. 3d 68, 98 (D.D.C. 2015) (citing *Scales*, 973 A.2d at 728).

*Smith v. United States*, 843 F.3d 509, 513 (D.C. Cir. 2016) (affirming district court's holding that the existence of probable cause for defendant's arrest foreclosed his malicious prosecution claim). Moreover, Plaintiff has offered no plausible allegations of malicious action on the part of his prosecutor, much less credible record evidence to call into question the exercise of prosecutorial discretion, present here in the face of established probable cause.   Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment as to Count V of the Amended Complaint.

**C.  Common Law Assault (Counts I and II)**

In its discretion, the Court will refrain from exercising supplemental jurisdiction over Plaintiff's remaining common law assault claims.  First, the "D.C. Circuit has cautioned that the Court has 'an obligation to exercise its discretion to remand the case to the District of Columbia courts once the federal question,'" in a case like this one, has been dismissed.  *Bedlion*, 177 F. Supp. 3d at 400 (quoting *Araya v. JPMorgan Chase Bank, N.A.*, 775 F.3d 409, 418–19 (D.C. Cir. 2014)); *see also* 28 U.S.C. § 1367(c)(3).  And unlike Plaintiff's common law claims for false arrest and malicious prosecution, Plaintiff's assault claims are not necessarily resolved by this Court's earlier Fourth Amendment analysis.  *See* Defs.' Mot. at 32–33; *see also Bedlion*, 177 F. Supp. 3d at 400 (declining to exercise jurisdiction over common law assault claim).  Furthermore, to the extent Plaintiff's assault claims implicate ambiguities in the common law, "the D.C. Superior Court is eminently more qualified than a federal court to navigate" through them.  *Araya*, 775 F.3d at 418.

Finally, "the Court finds that there are compelling reasons for not exercising jurisdiction over these claims and allowing the local court system to decide what are ultimately local issues." *Jackson v. District of Columbia*, 83 F. Supp. 3d 158, 172 (D.D.C. 2015).  For example, the impact of the MPD Use of Force Policy guidelines on the scope of Plaintiff's common law assault claims

is a uniqely localized matter concerning formative questions of local law enforcement policy.  *See* Pl.'s Opp'n at 17; Defs.' Mot., Ex. J; *see also Jackson*, 83 F. Supp. 3d at 172.  This is particularly true during a period when local policing practices have moved to the forefront of the District's collective conscience.  In view of these concerns, the Court concludes that it is most appropriate not to extend supplemental jurisdiction over Plaintiff's common law assault claims.  *See* 28 U.S.C. § 1367(c).  The Court therefore **DISMISSES** Counts I and II of the Amended Complaint **WITHOUT PREJUDICE**.

## V.    CONCLUSION

For the reasons set forth in this Memorandum Opinion, the Court **DENIES** Plaintiff's [49] Motion to Strike.  The Court **GRANTS** Defendants' [21] Motion for Summary Judgment, as to Plaintiff's claims for False Arrest (Counts III, IV, and VII), Malicious Prosecution (Count V), Excessive Force (Count VI), Fabrication of Evidence (Count VIII), and Retaliatory Arrest (Count IX).  The Court, however, will refrain from exercising supplemental jurisdiction over Plaintiff's claims of common law assault (Counts I and II) and will **DISMISS** those claims **WITHOUT PREJUDICE**.

An appropriate Order accompanies this Memorandum Opinion.

Dated:  September 30, 2020

/s/
_____
COLLEEN KOLLAR-KOTELLY
United States District Judge
